UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMERICAN SELECT
INSURANCE CO., *et al.*,

      Plaintiffs,

v.

GREAT LAKES WATER
AUTHORITY, *et al.*,

      Defendants.

_____/

Case No. 23-cv-11942
Hon. Matthew F. Leitman

**<u>ORDER (1) GRANTING IN PART AND DENYING IN PART
DEFENDANTS CITY OF DETROIT'S AND DETROIT WATER AND
SEWERAGE DEPARTMENT'S MOTION TO DISMISS (ECF No. 46) AND
(2) DENYING DEFENDANT GREAT LAKES WATER AUTHORITY'S
MOTION FOR JUDGMENT ON THE PLEADINGS (ECF No. 47)</u>**

The Detroit Water and Sewerage Department (the "DWSD"), a department of
the City of Detroit (the "City"), and the Great Lakes Water Authority (the "GLWA")
operate a combined sewer system that serves much of the Metropolitan Detroit area.
The DWSD operates the portion of that system that serves the City; the GLWA
operates the rest of the system.

In June of 2021, the sewer system overflowed and/or backed up after a
rainstorm hit the region.  The overflow/back-up damaged real and personal property
owned by residents insured by Plaintiffs American Select Insurance Company,
Westfield Insurance Company, and Westfield National Insurance Company

1

(collectively, "Plaintiffs"). Plaintiffs paid for the damage incurred by their insureds, and Plaintiffs now seek to recover from the DWSD, the City, and the GLWA the amounts they paid out. Plaintiffs claim that the Defendants are liable for the amounts paid to cover losses caused by the overflow/back-up because the sewer system they operated did not have sufficient capacity to handle the rainfall from the June 2021 storm and because they failed to properly maintain two pumping stations. (*See* Third Am. Compl., ECF No. 37.)

Now pending before the Court are (1) a motion to dismiss filed by the DWSD and the City (collectively, the "Detroit Defendants") (*see* Mot., ECF No. 46) and (2) a motion for judgment on the pleadings filed by the GLWA (*see* Mot., ECF No. 47). For the reasons explained below, the Detroit Defendants' motion is **GRANTED IN PART AND DENIED IN PART** and the GLWA's motion is **DENIED** in its entirety.

## I

### A

Plaintiffs are insurance companies that provide property insurance to "approximately 1,400 insureds" in Wayne, Oakland, and Macomb counties. (Third Am. Compl. at ¶¶ 1-3, ECF No. 37, PageID.486.) Plaintiffs' insureds suffered damages from flooding during the June 2021 storm, and "as a result of claims made on [the insureds' insurance policies]," Plaintiffs became entitled "to certain recovery

rights … including the claims giving rise to [this] cause of action." (*Id.* at ¶ 4, PageID.486-487.)

The Detroit Defendants and the GLWA are "governmental agenc[ies] that manage[] and [are] responsible for" the sewage disposal system in the City and surrounding counties. (*Id.* at ¶¶ 5-6, 8, 13, PageID.487-489.) "Historically, the [Detroit Defendants] owned and operated a sewer system that served wholesale customers – municipalities other than Detroit – and Detroit retail customers." (Resp., ECF No. 46, PageID.994.) But in 2015, the Detroit Defendants decided to "bifurcate" their sewer system. (*Id.*, PageID.995.) At that time, "a newly established, governmental agency, the GLWA, entered into a 40-year lease to operate and maintain exclusively the regional portion of [the Detroit Defendants' sewer] system and its assets" (the "Lease"). (*Id.*; *See also* Third Am. Compl. at ¶¶ 9, 14, ECF No. 37, PageID.488-491.) Under the terms of the Lease, the Detroit Defendants "retained control over only those assets it needed to serve local Detroit retail customers," while "the GLWA assumed 'all of the [Detroit Defendants'] duties, liabilities, responsibilities and obligations' associated with the regional sewer system" [*i.e.*, the portion of the system that served customers outside of the City]. (Mot., ECF No. 46, PageID.994, quoting Lease at § 4.4, ECF No. 25-1,

3

PageID.194.[1])  The Court will discuss the relevant terms of the Lease in much greater detail below.

**B**

On June 25 and June 26, 2021, "bursts of heavy rain in Wayne County, [Michigan] resulted in mass flooding throughout the county." (Third Am. Compl. at ¶ 15, ECF No. 37, PageID.491.)  That flooding "led directly to sewage disposal system events in which the overflow and/or backup of Defendants' sewage disposal system caused water and other liquids to overflow" onto "real property" owned by homeowners in Wayne, Oakland, and Macomb Counties. (*Id.* at ¶ 16.)  The resulting flooding caused substantial damage to those properties. (*See id.* at ¶ 10, PageID.489.) Many of the affected homeowners were insured by the Plaintiffs.  (*See id.* at ¶¶ 3-4, PageID.486.)  The homeowners then filed insurance claims with Plaintiffs, and Plaintiffs "paid" those claims "pursuant" to the terms of the homeowners' insurance policies. (*Id.* at ¶ 4, PageID.486.)

---

[1] The Court may consider the full terms of the Lease when resolving Defendants' motions because the Lease was quoted in, and excerpts were attached to, Plaintiffs' Third Amended Complaint.  It is also a public record that the Court may consider at this stage of the proceedings. *See, e.g.*, *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) ("When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein").

**C**

On August 7, 2023, Plaintiffs filed their initial Complaint in this action. (*See* Compl., ECF No. 1.)  Two months later, Plaintiffs filed a First Amended Complaint. (*See* First Am. Compl., ECF No. 16.)  In both of those pleadings, Plaintiffs invoked the Court's diversity jurisdiction on the basis that there is complete diversity of citizenship between the parties and that the amount in controversy exceeds $75,000. (*See* Compl. at ¶ 7, ECF No. 1, PageID.4; First Am. Compl. at ¶ 8, ECF No. 16, PageID.44).   And in both pleadings, Plaintiffs pursued a single claim: that Defendants' sewer system was defective because it "lack[ed]" the "capacity" to handle the "foreseeable rainfall" that fell during the June 2021 storm (the "Capacity Defect"). (Compl. at ¶¶ 13-14, PageID.45-46.)  Plaintiffs did not specifically identify any other alleged defects with the sewer system at that time.

The Court held a status conference to discuss the First Amended Complaint. During that conference, the Defendants took the position that Plaintiffs' First Amended Complaint failed to state a viable claim against them. (*See* Order, ECF No. 21, PageID.127.)  The Court decided to grant Plaintiffs leave to file a Second Amended Complaint.  It therefore directed the parties to conduct a substantive meet and confer during which the Defendants were to "identify" for Plaintiffs "any and all alleged deficiencies in the First Amended Complaint." (*Id.*)  The Court instructed

Plaintiffs to address those alleged deficiencies in their Second Amended Complaint. (*See id.*)

## D

Plaintiffs filed their Second Amended Complaint on November 26, 2023. (*See* Sec. Am. Compl., ECF No. 23.)  In that pleading, Plaintiffs re-alleged the Capacity Defect.  They also identified two other defects with Defendants' sewer system for the first time: a defect at the Conner Creek Pumping Station[2] (the "Conner Creek Pumping Station Defect") and a defect at the Freud Pumping Station (the "Freud Pumping Station Defect").  More specifically, Plaintiffs alleged that:

- Due "in part [to] power outages that Defendants knew were foreseeable issues to occur to their [sewer] system[] during storm events," "only three of the seven duty storm pumps at [the] important Freud Pump Station were available" and online during the June 2021 storm. (*Id.* at ¶¶ 17-18 and n.1, PageID.138-139.)  Those outages "either slowed or hampered the management of the disposal system" during the storm. (*Id.* at ¶ 17, PageID.138.); and

---

[2] In the parties' filings in this action, this pumping station has been alternatively referred to as the "Connors Creek Pumping Station," the "Conner Creek Pumping Station," and the "Connor Creek Pumping Station."  It appears that the correct name of the station is the "Conner Creek Pumping Station," and the Court will use that name throughout this order.

- "[A]t the GLWA's [Conner] Creek Pump Station, the elevation and configuration of the storm pumps required the operation of a vacuum pumping system prior to starting the storm pumps." (*Id.* at ¶ 20, PageID.139.)  Plaintiffs insisted that "due to the time required for priming prior to starting [those] pumps," "the stormwater pumping system's response did not keep pace with rapid increases in wet well levels" during the June 2021 storm. (*Id.*, PageID.139-140.)

The Detroit Defendants filed a motion to dismiss the Second Amended Complaint on December 11, 2023. (*See* Mot. to Dismiss, ECF No. 25.)  The GLWA filed a motion for judgment on the pleadings shortly thereafter. (*See* Mot. for Judgment, ECF No. 28.)

### E

On July 1, 2024, the Court held a hearing on Defendants' motions challenging the Second Amended Complaint. (*See* 07/01/2024 Mot. Hr'g Tr., ECF No. 39.) During that hearing, the Court questioned whether Plaintiffs had pleaded a viable claim with respect to the Capacity Defect.  More specifically, the Court suggested that Plaintiffs could not state a viable claim based upon the Capacity Defect by alleging, as they did, only that (1) the amount of rain that fell during the June 2021 storm was foreseeable and (2) that foreseeable amount of rain led to the overflow/back-up:

THE COURT: So let me take these defects one at a time. So the first defect relates to the design of the system, this idea that the system, as designed, was not sufficient to handle what you allege in your complaint, you call a foreseeable amount of rain.

MR. LEVINE: Yes.

THE COURT: And my question is, if we only know that –

MR. LEVINE: Yes.

THE COURT: – how can we say that is a defect? And let me put some more meat on the bone with the question.

MR. LEVINE: Sure.

THE COURT: The idea that a system can't handle a foreseeable amount of rain, to me, doesn't necessarily lead to – in fact, doesn't support the conclusion, without more information, about whether the system was defective. And let me give you a hypothetical that I was thinking of, that helps to illustrate the point.

You're familiar with the part of United States called Tornado Alley?

MR. LEVINE: Yes.

THE COURT: You know, Oklahoma, Kansas, where the Wizard of Oz was. So they get a lot of tornados there. In other words, if you ask somebody in Oklahoma or Kansas – and maybe my geography's bad, but you know what I'm talking about, the part they call the Tornado Alley. If you ask somebody there, are tornados foreseeable, I think we would all agree the answer is yes, of course a tornado is foreseeable.

8

And then if a tornado hit and it destroyed a home, I don't think anybody would say from those two facts, you could deduce that the home was defectively designed.

\* \* \* \*

THE COURT: The complaint omits three critical allegations to state a viable claim; whether the system failed to meet generally accepted design standards for similarly-situated municipalities, whether the storm was of a magnitude above or below the capacity that a system built to generally accepted standards could have handled; and the how or why the system should have had an increased capacity.

Those are the kinds of allegations that strikes me would be in a complaint where you're alleging that the design was defective. And yours, instead, says, the design couldn't handle a foreseeable amount of rain, and that's all it says about the design.

(07/01/2024 Hr'g Tr., ECF No. 39, PageID.704, 713)

After some discussion with Plaintiffs' counsel, the Court decided to grant Plaintiffs one final opportunity to amend their claim and plead additional facts that could support their allegations that Defendants' sewer system was defective.

**F**

Plaintiffs filed their Third Amended Complaint on July 23, 2024. (*See* Third Am. Compl., ECF No. 37.)  In that pleading, Plaintiffs bring a single claim against the Defendants arising out of the Capacity Defect, the Freud Pumping Station Defect, and the Conner Creek Pumping Station Defect.  With respect to the Capacity Defect, the Plaintiffs addressed the concerns raised by the Court at the earlier

9

hearing.  First, they added allegations describing the capacity standard with which a municipal sewer system must comply:

> 21. [T]he reasonable standard of capacity for a "combined sewer" system like the one owned and operated by the Defendants is set forth in various governmental documents, including but not limited to Michigan's Combined Sewer Overflow Control Program Manual, with which Defendants must comply. Such standards set forth therein speaks in terms of proper systems being able to manage rainstorms described as 10-year 1-hour rainfalls (and/or 25- year 1-hour rainfalls) without untreated overflow.
>
> 22. Such standards prescribe that a reasonable combined sewer system would be able to manage one-hour rainfalls in the maximum range of 1.83 inches to 2.1 inches.

(*Id.* at ¶¶ 21-22, PageID.492-493.)

Next, Plaintiffs added to the Third Amended Complaint allegations attempting to show that the Defendants' sewer system failed to satisfy this standard:

> 23. Based upon public rainfall data, at no point in time during June 25 to June 26, 2021 did more than [1.83 inches to 2.1 inches of rain] fall during any one-hour period, and rainfall even approaching such hourly level only occurred once between 1am and 2 am on the morning of June 26, 2021. At no other time during that two-day period did hourly rainfall ever exceed even a half of an inch, and the heaviest spells of rainfall were separated by one or more hours from each other in a manner that should have allowed a properly designed combined sewer system to manage the high-water intake. By way of one generally accepted source, the National Weather Service (within the National Oceanic and Atmospheric Administration) recorded total combined precipitation for the Detroit Metro area for the two days at only 2.37 inches.

24. Nonetheless, Defendants' combined sewer system for the service area on the dates of this storm was overwhelmed and was not able to meet the reasonable rainfall capacity for such a system.

(*Id.* at ¶¶ 23-24, PageID.492-493.)

Plaintiffs then clarified the allegations in the above-quoted paragraphs with the following footnote (the "Clarifying Footnote") that appears at the conclusion of paragraph 23:

While this information comes from publicly available historic weather data generated at limited specific locations within the sewer system's service area, Plaintiffs do not doubt that there may have been certain pockets of lesser or greater rainfall during the June 2021 storm. Nonetheless, the system as a whole was supposed to handle a much wider area than just an isolated pocket or two, and the average rainfall throughout the service area for those days was below the capacity standards, noted in part above, that a reasonably designed system is supposed to be able to manage.

(*Id.* at ¶ 23 n.1, PageID.493.)   In a subsequent filing, Plaintiffs further clarified that the "limited specific location" referenced in the Clarifying Footnote was a "gauge at Detroit [Metropolitan] Airport" in Romulus, Michigan. (Notice, ECF No. 75, PageID.1441.)   Romulus is located in Wayne County in the service area controlled by the GLWA. (*See id.*)

Finally, Plaintiffs alleged that "[d]espite Defendants' knowledge of such defective capacity issue, no significant expansions were undertaken in a timely manner before the June 2021 storm to remedy this defect by any of the Defendants,

11

including the Detroit Defendants who were able under the [Lease] to construct or operate additional wastewater facilities, or to construct or operate separated storm sewers for the purpose of reducing or eliminating overflows within the City." (Third Am. Compl. at ¶ 26, ECF No. 37, PageID.494.)

## G

The Detroit Defendants have now filed a motion to dismiss the Third Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). (*See* Mot, ECF No. 46.)  And the GLWA has filed a motion for judgment on the pleadings pursuant to Rule 12(c). (*See* Mot., ECF No. 47.)  In both motions, the Defendants argue that they are entitled to immunity from Plaintiffs' claims under Michigan's Governmental Tort Liability Act, and they claim that Plaintiffs have failed to plausibly allege that any exceptions to that immunity apply here. (*See id.*)  The Court held a hearing on both motions, and it is now prepared to rule on the motions.

## II

## A

The Detroit Defendants' motion under Rule 12(b)(6) and the GLWA's motion under Rule 12(c) are governed by the same standard.  *See Lindsay v. Yates,* 498 F.3d 434, 437 n.5 (6th Cir. 2007) ("[T]he legal standards for adjudicating Rule 12(b)(6) and Rule 12(c) motions are the same").  Rule 12(b)(6) provides for dismissal of a complaint when a plaintiff fails to state a claim upon which relief can be

granted. *See* Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, (2007)).  A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct. *Id.* (citing *Twombly*, 550 U.S. at 556).  When assessing the sufficiency of a plaintiff's claim, a district court must accept all of a complaint's factual allegations as true. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001).  "Mere conclusions," however, "are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664.  A plaintiff must therefore provide "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action" to survive a motion to dismiss. *Twombly*, 550 U.S. at 556.

**B**

As noted above, the Defendants have each asserted that they are immune from Plaintiffs' claims under Michigan's Governmental Tort Liability Act (the "GTLA"). Under the GTLA, "a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental

function." Mich. Comp. Laws § 691.1407(1).  The grant of immunity under the GTLA "is broad."  *Robinson v. City of Detroit*, 613 N.W.2d 307, 317 (Mich. 2000). Indeed, "[t]he immunity from tort liability provided by [the GTLA] 'is expressed in the broadest possible language—it extends immunity to all governmental agencies for *all* tort liability whenever they are engaged in the exercise or discharge of a governmental function.'" *Cannon Twp. v. Rockford Pub. Schs.*, 875 N.W.2d 242, 248 (Mich. Ct. App. 2015) (emphasis in original; quoting *Nawrocki v. Macomb Cnty. Rd. Comm'n*, 615 N.W.2d 702, 709 (Mich. 2000)).

The GTLA includes several enumerated exceptions to its broad grant of immunity, but those statutory exceptions are to be construed "narrowly." *Robinson*, 613 N.W.2d at 317.  A plaintiff, not a defendant, "bears the burden of pleading an exception to governmental immunity" under the GTLA. *Peterson v. Hymes*, 931 F.3d 546, 558 (6th Cir. 2019).  Thus, "a governmental body is immune from suit unless a plaintiff pleads in avoidance of governmental immunity by stating a claim that fits within a statutory exception." *Id.* at 557–58 (internal quotation marks omitted).

One such exception is what is known as the "Sewage Disposal System Event" exception (the "SDSE Exception"). *See* Mich. Comp. Laws § 691.1417.  Under the SDSE Exception, a plaintiff "may seek compensation for the property damage or physical injury from a governmental agency" if it suffers damages as a result of a

14

"sewage disposal event." Mich. Comp. Laws § 691.1417(3). The GTLA defines a "sewage disposal event" as "the overflow or backup of a sewage disposal system onto real property." Mich. Comp. Laws § 691.1416(k).

To defeat a defendant's invocation of immunity via the SDSE Exception, a plaintiff must plausibly allege each of the following elements:

> (a)    The governmental agency was an appropriate governmental agency.
>
> (b)    The sewage disposal system had a defect.
>
> (c)    The governmental agency knew, or in the exercise of reasonable diligence should have known, about the defect.
>
> (d)    The governmental agency, having the legal authority to do so, failed to take reasonable steps in a reasonable amount of time to repair, correct, or remedy the defect.
>
> (e)    The defect was a substantial proximate cause of the event and the property damage or physical injury.

Mich. Comp. Laws § 691.1417(3)(a)-(e). *See also Dubrulle v. Great Lakes Water Auth.*, 2026 WL 190343, at *10 (Mich. Ct. App. Jan. 22, 2026) (explaining that "to avoid the immunity afford to political subdivisions involving the overflow or backup of a sewer system, [a] plaintiff[] has to plead and prove each of the five elements under [Mich. Comp. Laws §] 691.1417(3)").

15

**III**

The Court begins with Plaintiffs' claims against the Detroit Defendants. For the reasons explained below, the Court declines to dismiss Plaintiffs' claim against those Defendants based upon the alleged Capacity Defect, but the Court will dismiss the claim against them to the extent that it is based upon the alleged Conner Creek Pumping Station Defect and the alleged Freud Pumping Station Defect.

**A**

The Court turns first to Plaintiffs' claim against the Detroit Defendants based upon the Capacity Defect. As explained above, the Detroit Defendants argue that they are entitled to immunity from that claim under the GTLA. And they say that Plaintiffs cannot overcome that immunity by relying on the SDSE Exception because Plaintiffs have failed to plausibly allege that the sewer system had a defect related to capacity. More specifically, the Detroit Defendants say that the allegations in the Third Amended Complaint "fall[] well short of the Court's mandate … that Plaintiffs show: the system is defective as designed by alleging a 'generally accepted design standard'; 'whether the storm was of a magnitude above or below the capacity that a system built to generally accepted standards could have handled'; and 'the how or why the system should have had an increased capacity.'" (Mot., ECF No. 46, PageID.990-991.) The Court disagrees.

16

As described above, Plaintiffs *did* include allegations in the Third Amended Complaint that addressed the shortfalls in their previous pleadings that the Court had identified, and they therefore have plausibly alleged a defect under the SDSE Exception.  First, they identified a generally accepted rainfall standard to which a sewer system must be designed: *i.e.*, the 10-year, 1-hour rainfall standard. (*See* Third Am. Compl. at ¶ 21, ECF No. 37, PageID.492.)  Second, they alleged that "at no point in time during the June 25 to June 26, 2021 [storm]" did the rain exceed that standard "during any one-hour period." (*Id.* at ¶ 23, PageID.493.)  Finally, they pleaded that the Detroit Defendants knew of the capacity shortfalls of the system and had the ability to remedy those shortfalls through, among other things, completing capacity-expanding construction, and failed to do so. (*See id.* at ¶ 26, PageID.494.) The Court is satisfied that, taken together, those contentions plausibly allege that the Detroit Defendants' sewer system had a known capacity defect that the Detroit Defendants could have, but failed to, remedy.

The Detroit Defendants counter that "Plaintiffs' claim is not plausibly alleged because they rely only on a single point of rain data from outside of Detroit [*i.e.*, the rainfall data collected at Detroit Metropolitan Airport]. They do not allege any facts about the rainfall that fell within Detroit, much less the particular parts of Detroit that experienced flooding." (Mot., ECF No. 46, PageID.1000.)  But the Detroit Defendants have not persuaded the Court that Plaintiffs must identify rainfall data

from a collection point inside the City (or within the portion of the City in which the sewer system backed up) in order to plausibly allege that the rainfall within the City fell below the 10-year, 1-hour standard.  Simply put, some rainfall collection points outside of the City will be close enough to the City to provide a reliable picture of the amount of rainfall within the City.  Imagine, for instance, a rainfall collection point 100 yards outside of the City limits.  Surely, rainfall data from that location could provide a reliable indicator of rainfall amounts within at least some portion of the City.  As this example illustrates, it does not make sense to adopt the Detroit Defendants' proposed bright-line rule that an allegation of rainfall amounts within the City is plausible only if that allegation rests upon rainfall data collected from a point within the City.

Instead, the proper question with respect to the plausibility of Plaintiffs' rainfall allegations is this: Is it plausible to infer that the rainfall within the City was below the 10-year, 1-hour standard based upon the fact that the rainfall at Detroit Metropolitan Airport was below that standard?  It is.  Detroit Metropolitan Airport is close enough to the City of Detroit that it is at least plausible that rainfall amounts at the airport provide a sufficiently accurate indicator of rainfall amounts with the relevant parts of the City.  Of course, discovery and factual development may reveal that to be untrue.  But for now, the Court concludes that Plaintiffs' allegation of

18

rainfall amounts within the City are plausible even though those allegations are based upon rainfall data collected at Detroit Metropolitan Airport.

Finally, the Detroit Defendants argue that if and to the extent that Court allows Plaintiffs to proceed with their claim arising out of the Capacity Defect, the Court should preclude Plaintiffs from recovering from the City any amounts they paid out to compensate for property damage incurred outside of the City.  In the Detroit Defendants' words, "Plaintiffs have not plausibly alleged a claim for relief based on insureds with properties outside of Detroit." (*Id.*, PageID.1009.)  Simply put, the Detroit Defendants contend that any sewer backup within the City could not have damaged Plaintiffs' insureds who live outside of the City.  The Detroit Defendants may be right.  But the Court cannot reach that conclusion at this point – before discovery and the development of a full record.  Indeed, the Court cannot exclude the possibility that a backup within the City seeped outside the City and caused damage in surrounding areas.

For all of the reasons explained above, the Court **DENIES** the Detroit Defendants' motion with respect to the Capacity Defect.

## B

The Court next turns to Plaintiffs' claim arising out of the Freud and Conner Creek Pumping Station Defects.  The Detroit Defendants again argue that they are entitled to immunity with respect that claim, and the Plaintiffs again rely on the

19

SDSE Exception to overcome the invocation of that immunity. The Detroit Defendants counter that the SDSE Exception does not apply to Plaintiffs' claim related to the Freud and Conner Creek Pumping Station Defects because Plaintiffs cannot establish one of the essential elements of that exception: that the Detroit Defendants had "the legal authority … to take reasonable steps in a reasonable amount of time to repair, correct, or remedy" the alleged defects at the two stations. Mich. Comp. Laws § 691.1417(3)(d). The Court agrees with the Detroit Defendants and therefore concludes that they are entitled to immunity as to the claim arising out of the Freud and Conner Creek Pumping Station Defects.

Under the Lease, the GLWA, not the Detroit Defendants, had the "legal authority" to repair any defects at the Freud and Conner Creek Pumping Stations. The Lease conveyed to the GLWA a leasehold interest in "all of the City's right, title and interest in and to the Leased Sewer Facilities," which included the Freud and Conner Creek Pumping Stations. (Lease at § 3.3, ECF No. 25-1, PageID.189-190; *id.* at Schedule A, PageID.226.) And the Lease provided that the GLWA "acquire[d], succeed[ed], and assume[d] the *exclusive* right, responsibility, and authority … to occupy, operate, control and use the Leased Sewer Facilities," including all "rights of access" to those facilities. (*Id.* at § 3.3, PageID.189-190; emphasis added.) The Lease did not provide that the City retained the right to enter/access the Leased Premises in order to conduct necessary repairs. Most

importantly, under the terms of the Lease, the GLWA assumed "*all* of the City's duties, liabilities, responsibilities, and obligations" associated with the Leased Sewer Facilities. (*Id.* at § 4.4, PageID.195; emphasis added.)

These provisions of the Lease plainly transferred to the GLWA the sole legal authority to repair defects at the Freud and Conner Creek Pumping Stations.  Stated another way, based on the express terms of the Lease, the Detroit Defendants do not have the "legal authority" to repair any identified defects at the Freud or Conner Creek Pumping Stations.   Plaintiffs therefore cannot overcome the Detroit Defendants' invocation of governmental immunity with respect to these alleged defects.

Plaintiffs disagree.  They insist that the Detroit Defendants effectively had the legal authority to make repairs to the two pumping stations because the Detroit Defendants could have enforced portions of the Lease that required the GLWA to make those repairs.  In support of this argument, Plaintiffs cite Section 5.1 of the Lease.   Under that Section, the GLWA promised that it would "keep the Leased Sewer Facilities in good condition and repair." (*See* Resp., ECF No. 48, PageID.1077-1078, quoting Lease at § 5.1, ECF No. 25, PageID.195.)  Plaintiffs insist that because the Detroit Defendants could have filed a civil action seeking to compel the GLWA to fulfill its obligations under that Section, the Detroit

21

Defendants should be deemed to have had the "legal authority … to repair, correct, or remedy" any defect at Freud and Connor Creek Pumping Stations. (*See id.*)

This argument cannot be squared with the Michigan Court of Appeals' recent decision in *Dubrulle*, *supra* – which involved a similar set of claims against the Detroit Defendants based upon their alleged failure to repair defects in the portion of the system leased by GLWA. In *Dubrulle*, the City argued that it was entitled to immunity from those claims "because it was not authorized to repair any defects in GLWA's system and thus could not be held liable for defects in that system." *Dubrulle*, 2026 WL 190343, at \*15. The Michigan Court of Appeals agreed. The court reviewed the Lease – including Section 5.1 and the other sections identified by this Court above – and concluded, based upon its reading of those Sections, that the City did not have the authority to repair defects in portions of the system operated by the GLWA and that the City was therefore immune from claims based upon those defects. *See id.* at \*15–16. The Court sees no reason to depart from the holding in *Dubrulle*.

Plaintiffs counter that *Dubrulle* is not controlling because the plaintiffs in that case did not raise all of the same arguments concerning the Detroit Defendants' right to make repairs that Plaintiffs have raised here. More specifically, Plaintiffs say that the Michigan Court of Appeals never considered their argument that the Detroit Defendants "could still exert control over the regional [sewer system]" by filing a

civil action against the GLWA to enforce Section 5.1 of the Lease. (Third Am. Compl. at ¶ 14(c), ECF No. 37, PageID.490.) But as noted above, the Michigan Court of Appeals in *Dubrulle did* expressly consider Section 5.1 of the Lease.

In any event, the Court is not persuaded by Plaintiffs' argument that the Detroit Defendants had the legal authority to make repairs to the portion of the system under the GLWA's control because they could have sought a court order under Section 5.1 of the Lease compelling the GLWA to make the repairs. Having the ability to seek a court order to compel another party to take action is not the same as having the legal authority to take the action in the first instance.

For all of these reasons, the Court **GRANTS** the Detroit Defendants' motion with respect to the claims arising out of the Freud and Conner Creek Pumping Station Defects.

## IV

The Court next turns to the GLWA's motion for judgment on the pleadings. In that motion, the GLWA argues that it is entitled to governmental immunity, and Plaintiffs argue that their claim falls within the SDSE Exception to that immunity. The Court **DENIES** the motion.

First, for all of the reasons (explained above) that the Detroit Defendants are not entitled to dismissal of the claim arising out of the Capacity Defect, the GLWA likewise is not entitled to judgment on the pleadings on that claim. Indeed, that

23

claim may be even stronger as against the GLWA because Plaintiffs' rainfall data comes from a collection point within the GLWA's service area.

Second, the Court also denies the GLWA's motion to the extent that it seeks judgment on the pleadings for the portions of Plaintiffs' claim arising out of the Freud and Conner Creek Pumping Station Defects. The GLWA's motion barely mentions the claim arising out of the alleged defects at those two pumping stations. Instead, the GLWA focuses the majority of its motion on the Capacity Defect. (*See* Mot., ECF No. 47, PageID.1053-1059.) To the extent the motion even arguably addresses the defects at the two pumping stations, the GLWA "incorport[ed] by reference … the additional arguments … set forth [in the Detroit Defendants' motion] to the extent applicable to the GLWA as well." (*Id.*, PageID.1059.) But the Detroit Defendants' arguments with respect to the Freud and Conner Street Pumping Stations were unique to the Detroit Defendants and do not apply to the GLWA. Indeed, one of the Detroit Defendants' primary arguments with respect to the alleged defects at those stations – and the argument that the Court found persuasive above – was that to the extent a party had the legal authority to cure a defect at the Freud or Conner Creek Pumping Station, that authority rested with the GLWA, not the Detroit Defendants. Thus, because the GLWA presented no specific argument in its motion with respect to Plaintiffs' claims arising out of the Freud Pumping Station Defect or the Conner Creek Pumping Station Defect, the Court will deny GLWA's motion to

24

the extent that it seeks dismissal of those portions of Plaintiffs' claim on that basis alone.

Despite the GLWA's failure to address the Freud or the Conner Creek Pumping Station Defects in its motion, the Court nonetheless asked the GLWA (at the hearing on its motion) to identify the basis on which it believes that it is entitled to judgment on the claim arising out of those defects. Counsel for the GLWA responded that Plaintiffs could not rely on the SDSE Exception with respect to those defects because Plaintiffs had failed to plausibly allege that defects at those two stations were the proximate cause of damages to Plaintiffs' insureds. *See* Mich. Comp. Laws § 691.1417(3)(e). The Court disagrees. Plaintiffs allege that because of specific defects at the Freud and Conner Creek Pumping Stations, the GLWA's sewer system was not functioning at its normal capacity and that that below-capacity operation caused the damages to Plaintiffs' insureds. Those allegations are plausible. The issue of proximate cause here is properly resolved after development of a full factual record.

## V

For all of the reasons explained above, **IT IS HEREBY ORDERED** as follows:

- The Detroit Defendants' motion to dismiss (ECF No. 46) is **DENIED** with respect to the Capacity Defect and **GRANTED** in all other respects; and

25

- The GLWA's motion for judgment on the pleadings (ECF No. 47) is

  **DENIED** in its entirety.

  **IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  June 2, 2026


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 2, 2026, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126
